### STATE v. WILLIAM JOSEPH DUNHEEN.

(Filed 13 December, 1944.)

**1. Homicide § 4c—**

When a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving or torture, the means and method used involves planning and purpose. Hence, the law presumes premeditation and deliberation. The act speaks for itself. G. S., 14-17.

**2. Homicide § 27c—**

In a prosecution on an indictment for murder in the first degree, where all of the State's evidence tended to show that the accused lay in wait for the deceased, concealed behind a hedge along a street frequented by her and shot her with a gun twice as she went along with a companion, there being no evidence of a quarrel or ill feeling and the accused offering no testimony, the court's charge that the jury must return one of two verdicts, either murder in the first degree or not guilty, is without error.

**3. Homicide § 27f—**

Where there is an unsuccessful attempt, in a trial for murder, to bring out on cross-examination of the State's witnesses evidence of the insanity of the accused, whereupon the court gave the accused the full benefit of the plea and charged fully on insanity as a defense, there is no error of which defense can complain.

**4. Criminal Law §§ 58, 82—**

On suggestion by defendant's counsel here that, since the trial below on an indictment for murder, he has come into possession of material evidence tending to show the insanity of the defendant, he is at liberty to present it to the court below at the next succeeding criminal term on a motion for a new trial for newly discovered evidence.

APPEAL by defendant from *Phillips, J.,* at June Term, 1944, of GUILFORD. No error.

Criminal prosecution on bill of indictment charging the murder of one Laura Elizabeth Riley.

Defendant and the deceased had been "keeping company" for about eighteen months. On 6 May, 1944, defendant purchased a twelve-gauge shotgun and obtained five shells. He stated to the person from whom he obtained the gun and shells that he wanted them to shoot frogs and moccasins. On the night of 8 May he concealed the gun in a hedge around a mill lot on the edge of Minneola Street in the town of Gibsonville. This was the street sometimes used by the deceased in going to and from her home. At about 8:00 o'clock on the morning of 9 May he was seen stooping behind the hedge. He was also observed by other witnesses from time to time behind the hedge up to the time of the homicide. About 9:15 a.m. deceased and a companion passed along Minneola

Street within about 40 feet of the gateway to the mill and the hedge behind which the defendant was standing. As they passed, defendant shot the deceased and "He stepped back and did something to his gun and came back and shot immediately again." He was then seen leaving through the gate at or near the point he had been stooping and standing. The companion of deceased spoke to him and asked him why he shot, but he made no reply. On his way to his home he threw the gun in some weeds near the street. When apprehended and before being informed of the cause of his arrest he inquired, "Is she dead?" Later he admitted shooting once and said he recognized deceased by the red coat she was wearing. There was no evidence of any prior disagreement or ill feeling between defendant and deceased.

The jury returned for its verdict "Guilty of the felony of murder in the first degree as charged in the bill of indictment." The court pronounced judgment of death by asphyxiation. Defendant excepted and appealed.

*Attorney-General McMullan and Assistant Attorneys-General Rhodes and Moody for the State.*

*W. Henry Hunter for defendant, appellant.*

BARNHILL, J. In its charge the court instructed the jury in part as follows:

"(Now, gentlemen of the jury, as you find the facts to be from the evidence in this case under your oath you will return one of two verdicts. First, you will return a verdict of guilty of murder in the first degree if you find from the evidence and beyond a reasonable doubt that the defendant secured a shotgun, loaded a shotgun or had a loaded shotgun on the 9th of May, 1944, and was at the scene of the alleged killing, waylaid and secreted himself from the deceased and waited for her to come along while so secreted and while so waylaid, and when she did come along he shot her with a shotgun and she died as a result of such wound then, gentlemen of the jury, your verdict would be guilty of murder in the first degree.)

"If you fail to find from the evidence and beyond a reasonable doubt that those are the facts, that the person who did the shooting was someone else or that the defendant was not there, did not waylay the deceased, did not secret himself in the hedge and wait for her to come along and if she did come along he was not the person who shot and killed her as a result of the shooting, under those circumstances your verdict would be not guilty." The defendant excepted to that part within parentheses.

When a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, the means and method used involve

planning and purpose. Hence the law presumes premeditation and deliberation. The act speaks for itself. G. S., 14-17. Is this presumption rebuttable by proof that the prisoner is of such low mentality that he is incapable of forming a fixed design to kill? This is the interesting question defendant seeks to raise on this appeal. Unfortunately for him the record fails to present the question for decision.

The defendant offered no testimony, but his counsel made a diligent effort to develop by cross-examination some evidence of insanity. As a result the record discloses the following:

The defendant was kept in a private cell for some time. A "trusty" was placed with him as guard.

A witness was asked:

"Mr. Murphy, is it not the general practice in the Sheriff's Department when a man is put in and there is a question about his sanity for them to put him in a private cell? Objection by State. Sustained. Exception."

This witness then testified:

"We have recently had some jail breaks in which prisoners charged with murder have escaped from jail. This kind of procedure in this case was a precaution to prevent a recurrence of that."

The companion of the deceased at the time of the homicide testified on cross-examination:

"No statement was made by me or by Miss Riley in the defendant's presence about how crazy he looked and acted . . . I did not make any statement after we left the carnival about leaving her with him (by herself) . . . I am sure that I did not say anything that day after we left the carnival about how he looked or acted. He acted all right at the carnival . . ."

The coroner testified:

"From my conversation with the defendant in jail, on the way back, I do not have a clear opinion as to what his mental condition was on the morning of this crime. I don't think my observation was sufficient to state medically other than just an impression, rather than a definite medical opinion.

"Q. What was your impression of his mental condition? Objection by the State. Sustained. Exception."

The record of the testimony of the father of the deceased discloses the following:

"Q. Mr. Riley, I ask you if some time during the week before this happened if you did not tell him you thought it would be a good idea for him to go back home and get him an outside job and try to regain his health? Objection by the State. Sustained. Exception."

A deputy sheriff stated on cross-examination:

"He told me at that time that he had a brother and he was in the hospital. He said he was 'in the hospital.' He did not tell me at that time that his uncle on his mother's side was in an insane asylum in Vermont. He has talked to me since and told me since. In this conversation he did not mention an uncle."

These are the only references in the record to the mental condition of the defendant. There is no evidence here of low mentality.

The rulings of the court are without error. The question asked the deputy sheriff related to a general custom at the jail and the coroner stated he had formed no opinion as to the mental condition of the defendant. What he may have said about his "impression" does not appear.

Although there was no evidence of insanity or low mentality, the court, out of an abundance of caution, desiring no doubt to protect every possible right of the defendant, gave him the benefit of his plea and charged fully on insanity as a defense. It then instructed the jury further as follows:

"But if the defendant has satisfied you from the evidence in the case, bearing in mind the rules of law the Court has heretofore given you and defined as to mental insanity, low order of intelligence, if the defendant has satisfied you from the evidence not beyond a reasonable doubt or by the greater weight of the evidence, but simply satisfied you at the time he shot and killed the deceased, if he shot and killed the deceased, that he was an insane person or was not mentally capable of forming a criminal intent and putting it into execution or that he was of such low order of mental status that he was incapable of committing this crime, that he was an insane person or insane to the extent that he was incapable of forming a criminal intent, bearing in mind the definition the Court gave you, then he would not be guilty."

Thus the court gave the defendant the benefit of the very contention made here and directed the jury to return a verdict of not guilty if they found he "was not mentally capable of forming a criminal intent and putting it into execution." Certainly on this phase of the trial defendant had no just cause to complain.

We have carefully examined defendant's other exceptive assignments of error. In them we find no cause for disturbing the verdict and judgment.

Counsel for the defendant suggests here that since the trial below he has come into possession of material evidence tending to show insanity of the defendant. If so, he is at liberty to present it to the court below at the next succeeding criminal term on a motion for a new trial for

newly discovered evidence. *S. v. Casey,* 201 N. C., 620, 161 S. E., 81; *S. v. Edwards,* 205 N. C., 661, 172 S. E., 399.

In the trial below we find

No error.