STATE OF NORTH CAROLINA v. JOSEPH BARBOUR, JR., ALSO KNOWN AS ANDY BARBOUR

No. 36

(Filed 8 May 1978)

**1. Jury § 7.13— first degree murder—number of peremptory challenges**
    The trial court in a first degree murder case properly limited defendant to six peremptory challenges of jurors rather than permitting him the fourteen challenges allowed in capital cases where the death penalty could not have been imposed on defendant because it had been declared unconstitutional and the act reinstating the death penalty did not apply at the time of defendant's crime.

**2. Homicide § 21.5— first degree murder—premeditation and deliberation—sufficiency of evidence**
    The State's evidence was sufficient to support a finding that defendant shot deceased with premeditation and deliberation and was guilty of first

degree murder where it tended to show that defendant went to deceased's hotel room for the purpose of getting money owed to him and, when deceased refused to pay, that defendant intentionally shot him three times, once while he was on the floor and helpless.

**3. Homicide § 18.1— premeditation and deliberation—shot while deceased felled not fatal shot**

Evidence that defendant shot deceased in the back after he had been felled by two prior shots was competent to show premeditation and deliberation even though one of the prior shots was the fatal one.

**4. Homicide § 19.1— self-defense—character of deceased—act of violence in defendant's presence**

Where the defendant in a homicide prosecution testified that deceased produced a gun and threatened to kill him, and that the gun went off while he wrestled deceased for the gun, the trial court improperly limited defendant's efforts to show the character of deceased as a violent and dangerous fighting man by refusing to permit defendant to testify that once, while at a night spot, he saw deceased run out and hit a man passing by with a pair of brass knuckles.

**5. Homicide § 19.1— self-defense—character evidence based on personal experience—reputation in community**

In a homicide case in which defendant presented evidence that deceased was the first aggressor, the trial court properly struck testimony by deceased's wife that she knew deceased's character to be dangerous and violent when it was disclosed on cross-examination that she was speaking from personal experience; however, the court erred in refusing to allow deceased's wife to relate on redirect examination the deceased's reputation in the community for violence on the ground that her earlier testimony indicated that she did not know deceased's reputation from other persons, since the earlier question related only to deceased's character and not to his reputation in the community, and the witness stated that she knew what others in the community said about deceased's reputation for violence.

**6. Criminal Law § 113.9— summary of evidence—statement of material fact not in evidence**

The trial court in a homicide prosecution committed prejudicial error in instructing the jury that the State offered evidence that defendant had a pistol in his hand when he came into deceased's room where there was no evidence that defendant had a gun in his hand until after the deceased had been shot, and there was a conflict in the evidence as to whether deceased or defendant first had the gun and was the aggressor.

DEFENDANT appeals, pursuant to G.S. 7A-27(a), from a conviction of first degree murder and sentence of life imprisonment, *James, J.,* 22 August 1977 Term, WILSON County Superior Court.

The State's principal witness, Nancy Sessoms, testified to the following: Between December, 1976, and May, 1977, she and the deceased, Charles W. "Tommy" Gregory, had been dating and were planning to be married as soon as they were divorced from their then-current spouses. On 3 May 1977, she was working as a desk clerk in Wilson at the Cherry Hotel, where the deceased lived. The witness got off work on this date at 11:00 p.m. and went up to the deceased's room, where she observed the deceased and defendant arguing over $20.00 that the deceased allegedly owed defendant. The two men were drinking from a bottle of liquor in the room. The deceased, during the argument, told defendant to leave and the two of them went into the hall outside the room, where defendant said that he would be coming back after his $20.00.

The witness then went downstairs, got her television and returned to the deceased's room, at which time defendant was gone. Approximately thirty-five minutes later, there was a knock at the door and the person outside identified himself as "Andy." The witness glanced up and saw the deceased admit a man to the room and then resumed watching television. She heard the man tell the deceased that he needed his $20.00 to get a room for the night because his wife had thrown him out. The deceased responded that he didn't have the money.

The witness next heard a gunshot, whereupon she looked up and saw defendant standing over the deceased, who was lying on the floor. The witness grabbed a stick and began to beat defendant on the back with it until he pointed a pistol at her. She then dropped the stick and backed away and, when she looked again, saw defendant standing against the door to the room. The deceased at that time was in a semi-kneeling position with his arms around defendant's waist. At this point, there was a second shot and the witness moved over to the deceased and knelt beside him, placing her hands around his back. Defendant then went into the hall, pointed the gun at the deceased, who had not moved, and shot him in the back. A subsequent autopsy revealed an alcohol content in the deceased's blood of .31 milligrams percent.

Defendant, Joseph "Andy" Barbour, Jr., testified substantially as follows: He and the deceased met around noon on the day of the killing at Willie's Grill. While there, they discussed the sale of

State v. Barbour

a pistol by defendant to the deceased. Defendant subsequently went home, where he ate, took a drink of liquor and slept. Carrying the pistol he and the deceased had discussed, defendant returned to Willie's Grill at about 4:30 p.m., where he again met the deceased. The two of them remained at the Grill until approximately 6:45 p.m., during which time they drank five or six beers each. They then went to the deceased's room at the Cherry Hotel, where they drank two more beers each and some liquor that defendant had sent the deceased out to purchase. Upon his arrival at the room, defendant had removed the pistol from his pocket and placed it on the floor near the head of the bed. At about 11:00 p.m., defendant went home. He returned to the room later to get $20.00 he had won from the deceased in a gambling game they were playing.

When he reached the room, defendant was admitted by the deceased, stepped inside and closed the door behind him. He then asked the deceased if he was going to pay him his money. The deceased produced a pistol and told defendant that he was going to kill him. Defendant at this point grabbed the deceased's arm and hand in which he held the pistol and started wrestling with him, during which time Nancy Sessoms began beating defendant in the back with a stick. In the midst of this altercation, the pistol fired. The deceased slipped down and grabbed defendant around the waist. Defendant then backed toward the door, dragging the deceased with him, all the while being beaten by Nancy Sessoms. When he reached the door, Sessoms struck at his face with the stick and defendant threw up his arm as a shield, at which point the gun in his hand, which he had wrestled away from the deceased, fired again. The deceased then relaxed his hold and defendant opened the door and left. Defendant recalled hearing only two shots fired during this encounter.

Medical testimony revealed that the deceased had been shot three times.

Additional facts pertinent to the decision are related in the opinion.

*Connor, Lee, Connor, Reece & Bunn, by Cyrus F. Lee and James F. Rogerson, for defendant-appellant.*

*Attorney General Rufus L. Edmisten, by Assistant Attorney General James L. Stuart, for the State.*

COPELAND, Justice.

After careful examination of defendant's numerous assignments of error, we find that sufficient prejudicial error occurred below to warrant a new trial. Our initial discussion is directed to two assignments which are without merit but likely to be raised on retrial.

[1] Defendant argues that the trial court erred in limiting him to six peremptory challenges during jury selection. Under G.S. 9-21(a), each defendant is allowed fourteen peremptory challenges in *capital* cases but only six in all other cases. Because North Carolina's mandatory death penalty law was declared unconstitutional in *Woodson v. North Carolina,* 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), and the act reinstating capital punishment here applies only to murders committed on or after 1 June 1977, 1977 N.C. Sess. Laws, c. 406, the death penalty could not have been imposed on this defendant. It is defendant's position, nonetheless, that the Legislature's intent in G.S. 9-21(a) was to provide a defendant with more peremptory challenges when he is on trial for the most serious crime recognized in our law, regardless of whether a conviction might subject him to the ultimate sanction.

The Court of Appeals previously has noted, however, that "A *capital* case has been defined as one in which the death penalty may, but need not necessarily, be imposed." *State v. Clark,* 18 N.C. App. 621, 624, 197 S.E. 2d 605, 607 (1973). If, therefore, it is determined during jury selection in a prosecution for a crime which formerly had been punishable by death that the death penalty may not be imposed upon conviction, the case loses its capital nature, thereby rendering statutes providing for an increased number of peremptory challenges in capital cases inapplicable. *United States v. McNally,* 485 F. 2d 398 (8th Cir., 1973), *cert. denied,* 415 U.S. 978, 39 L.Ed. 2d 874, 94 S.Ct. 1566 (1974); *Martin v. State,* 262 Ind. 232, 314 N.E. 2d 60 (1974), *cert. denied,* 420 U.S. 911, 42 L.Ed. 2d 841, 95 S.Ct. 833 (1975); *State v. Haga,* 13 Wash. App. 630, 536 P. 2d 648, *cert. denied,* 425 U.S. 959, 48 L.Ed. 2d 204, 96 S.Ct. 1740 (1976); *People v. Watkins,* 17 Ill. App. 3d 574, 308 N.E. 2d 180 (1974). This assignment of error is overruled.

State v. Barbour

Defendant next contends that his motions for a directed verdict of acquittal of first degree murder should have been allowed because there was insufficient evidence to support this charge. A motion for directed verdict challenges the sufficiency of the evidence to go to the jury and has the same legal effect as a motion for compulsory nonsuit. *State v. Glover*, 270 N.C. 319, 154 S.E. 2d 305 (1967). In ruling on a motion for nonsuit, the evidence must be considered in the light most favorable to the State, giving the State the benefit of every inference reasonably to be drawn in its favor. *State v. Chapman*, 293 N.C. 585, 238 S.E. 2d 784 (1977).

A motion for nonsuit of a first degree murder charge must be denied if there is evidence tending to show an unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977). Premeditation is " '. . . thought beforehand for some length of time, however short,' " while deliberation means " '. . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation.' " *State v. Reams*, 277 N.C. 391, 401-402, 178 S.E. 2d 65, 71 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74, 92 S.Ct. 133 (1971). Premeditation and deliberation usually must be established by circumstantial evidence, since there is seldom direct evidence of these elements. *State v. Van Landingham*, 283 N.C. 589, 197 S.E. 2d 539 (1973). "Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled." *Id.*, at 599, 197 S.E. 2d at 545.

[2]   In the instant case, the State's evidence tended to show that: (1) defendant left the deceased's hotel room after an argument over $20.00 the deceased allegedly owed him; (2) before he departed, defendant told the deceased he was coming back after his $20.00; (3) while riding home in a taxi, defendant told the driver that he was going to "whup" somebody; (4) after defendant returned to the deceased's room and was admitted, he told the deceased he needed his $20.00 and the deceased replied that he

didn't have the money; (5) nothing further was said by the two men and the next sound of sufficient magnitude to divert the State's witness's attention from the television set was a gunshot; (6) after the deceased had been shot a second time, defendant allowed Nancy Sessoms to go to him and hold him up; (7) defendant then stepped into the hall and, while the deceased was on his knees being supported by Nancy Sessoms, shot him in the back. We conclude that this evidence was sufficient to allow the jury to infer that defendant went to the deceased's room for the purpose of getting money owed to him and, when the deceased refused to pay, that defendant intentionally shot him three times, once while he was on the floor and helpless.

[3] Defendant argues that premeditation and deliberation cannot be inferred from the third shot, fired while the deceased was down, because the evidence tended to show that one of the shots which entered the front of the deceased's body was the fatal wound and that the shot in the back was not mortal. Nonetheless, this was a blow from a deadly weapon, delivered while the victim was helpless and unarmed and we have not required that such blows be found to be fatal in order to support an inference of premeditation and deliberation. *See, State v. Baggett*, 293 N.C. 307, 237 S.E. 2d 827 (1977). We find that there was adequate evidence here to permit the jury to conclude that defendant shot and killed the deceased with premeditation and deliberation; therefore, this assignment of error is overruled.

[4] Defendant also contends that the trial court erred in unduly limiting his efforts to show the character of the deceased as a violent and dangerous fighting man. The first instance assigned as error involves the refusal of the court to allow defendant during direct examination to relate a specific act of violence committed in his presence by the deceased. Defendant, if permitted, would have stated that once, while at a night spot, he saw the deceased run out and hit a man passing by with a pair of brass knuckles.

Where the defendant in a homicide prosecution has offered evidence tending to show self-defense, testimony by him of specific acts of violence committed by the deceased in his presence or of which the defendant had knowledge prior to the homicide is admissible to show the deceased's character as a

violent and dangerous fighting man in order to permit the jury to determine whether the defendant acted under a reasonable apprehension of danger to his person or his life. *State v. Johnson,* 270 N.C. 215, 154 S.E. 2d 48 (1967). Defendant here testified that when he returned to the deceased's room and asked for his money, the deceased produced a pistol and told defendant that he was going to kill him. At this point, defendant maintained, he grabbed for the gun and began wrestling with the deceased and during this altercation the gun went off. Evidence of defendant's knowledge of the deceased's past history of violence would certainly assist the jury in assessing the reasonableness of defendant's actions to protect himself when faced with this threat on his life. Failure to admit this testimony was error.

[5] Defendant further excepts to the trial court's exclusion of testimony by the deceased's wife concerning the deceased's reputation in the community for being a dangerous and violent man. In the course of defendant's direct examination of this witness, she had stated that she knew the deceased's character to be dangerous and violent; however, on cross-examination it was disclosed that she was speaking from personal experience rather than relating what others in the community said about the deceased. Upon hearing this statement, the court intervened and instructed the jury to disregard the witness's entire reputation testimony up to that point because it was not based on what people in the community said about the deceased. Defense counsel then asked the witness on redirect examination if she knew what others in the community said about the deceased's reputation for being a dangerous and violent man. She replied that she did, but the court refused to allow her to relate this reputation, stating that her earlier response indicated that she did not know the deceased's reputation from other persons.

Evidence of the deceased's violent character, whether known to the defendant or not, is admissible in a homicide case where self-defense is in issue and the State's evidence is wholly circumstantial or the nature of the transaction is in doubt in order to shed light on the question of which party was the first aggressor. *State v. Blackwell,* 162 N.C. 672, 78 S.E. 316 (1913); Stansbury's N.C. Evidence (Brandis Rev., 1973), § 106; McCormick, Handbook of the Law of Evidence (2d ed., 1972), § 193. As noted earlier, defendant here testified that the deceased produced

the gun first and threatened to kill him, thus precipitating the altercation. The State's evidence raises contrary inferences and this conflict in turn presents the question of which party was the actual aggressor. Evidence of the deceased's violent character would be highly relevant in resolving this.

The trial court's actions in excluding this witness's testimony regarding specific acts of violence by the deceased which were not shown to be within defendant's knowledge prior to the homicide and striking her statements as to the deceased's violent character based solely on her personal experience were correct, since specific acts and a witness's personal opinion are not admissible to show another person's character as evidence of his conduct on a particular occasion. *Stansbury's N.C. Evidence, supra, § 110.* Nonetheless, the court erred in refusing to allow her to relate on redirect examination the deceased's reputation in the community for violence. *State v. Blackwell, supra.* The exclusion of this testimony was apparently based on the court's conclusion that when the witness stated that her earlier character testimony was grounded on personal experience, this implied that she did not know his reputation in the community. An examination of the record discloses that such was not the case, however, because the witness had only been asked what the deceased's character for violence was and not his reputation in this respect. It thus seems that the witness merely misapprehended the nature of the question and, when this confusion was corrected, should have been allowed to answer the proper inquiry. The witness, if permitted to answer, would have stated that she had heard others in the community speak of the deceased's character as being dangerous, violent and mean.

[6] It is further argued that the trial court erred in summarizing the evidence in its charge by stating:

"[T]hat when [defendant] came to the room, he knocked on the door and was admitted; *that he had a pistol in his hand*; that some words were used; . . . that after a short pause, a pistol shot was heard; that the deceased fell to the floor." (Emphasis added.)

This instruction tends to indicate that when defendant entered the room he had a pistol in his hand; yet, Nancy Sessoms, the only State's witness present at the time of the shooting,

nowhere testified that she saw a gun in defendant's hand when he first returned. Indeed, on cross-examination Sessoms stated that she did not see a gun until after she heard the first shot. Such an instruction is highly misleading and prejudicial in that it strongly reinforces the State's position that defendant came to the room armed and prepared to get his money or kill the deceased, when there was no evidence that defendant had a gun in his hand until after the deceased had been shot once.

Although the court ordinarly should be informed of an inaccuracy in the summary of the evidence in the charge during or at the conclusion of the instructions so that any error may be corrected, a statement of a material fact not in evidence will constitute reversible error whether or not it is called to the court's attention. *State v. McCoy*, 236 N.C. 121, 71 S.E. 2d 921 (1952); *but cf.*, *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233, 53 L.Ed. 2d 306, 97 S.Ct. 2339 (1977), (misstatements of collateral matters must be called to the court's attention before the case is submitted to the jury). This instruction, together with the previously noted erroneous exclusion of evidence of the deceased's character as a violent and dangerous fighting man, constitute manifest prejudice to this defendant; consequently, he must be afforded a new trial.

Since the events which form the basis of defendant's remaining assignments of error may not recur on retrial, we deem it unnecessary to discuss them.

For the reasons stated, defendant's conviction is set aside and the case remanded for

New trial.